EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ángel Rafael Delgado Pol <br><br> Recurrido <br><br> v. <br><br> Manuel Francisco Pietri Vélez <br><br> Recurrido <br><br> v. <br><br> Edgardo Crespo Rodríguez <br><br> Peticionario <br><br> Gerardo González González <br><br> Interventor-Recurrido | <br><br><br><br><br> Certiorari <br><br> 2022 TSPR 02 <br><br> 208 DPR ____ |

Número del Caso:  CC-2020-159

Fecha: 13 de enero de 2022

Tribunal de Apelaciones:

    Panel Especial – Orden Administrativa TA-2020-0004

Abogado de la parte peticionaria:

    Lcdo. Ernesto Vergne Ramos

Abogados de la parte recurrida:

    Lcda. Taína Maite Colón Rodríguez
    Lcdo. Carlos Juan Cardona Rosado

Materia: Derecho Registral y Notarial – Razones para la nulidad de un acta aclaratoria y de subsanación otorgada por un notario para establecer la distribución de la responsabilidad hipotecaria por la cual determinados bienes inmuebles enajenados responderían en garantía de cierto pagaré al portador.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ángel Rafael Delgado Pol<br><br>    Recurrido<br><br>        v.<br><br>Manuel Francisco Pietri Vélez<br><br>    Recurrido<br><br>        v.<br><br>Edgardo Crespo Rodríguez<br><br>    Peticionario<br><br>Gerardo González González<br><br>    Interventor-Recurrido | CC-2020-159 | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 13 de enero de 2022.

En esta ocasión, nos corresponde determinar si el Tribunal de Apelaciones actuó correctamente al declarar nula cierta *Acta aclaratoria y de subsanación*, en la cual se modificaron determinadas escrituras de hipoteca previamente otorgadas, a los fines de fijar el porciento de responsabilidad hipotecaria por el cual determinados inmuebles (dos [2], en este caso) responderían en garantía de cierto pagaré al portador. Ello, sin la presencia del deudor, el acreedor ni de terceros afectados.

Tras evaluar detenida y minuciosamente el expediente del caso ante nuestra consideración, así como el derecho aplicable a las controversias existentes en el mismo, concluimos que el foro apelativo intermedio, en efecto, actuó correctamente al decretar la nulidad del *Acta aclaratoria y de subsanación* objeto del presente litigio.

Ahora bien, los fundamentos y el proceder del Tribunal de Apelaciones no fueron suficientes para la total y correcta disposición de la causa de epígrafe. Lo anterior, pues, procedía también que se expresara en cuanto a la validez de las escrituras de hipoteca que dieron paso al *Acta Aclaratoria y de subsanación* que hoy declaramos nula. Escrituras que, como cuestión de derecho, también son nulas. Veamos.

I.

Allá para el 11 de julio de 2014, el señor Ángel Rafael Delgado Pol (en adelante, "señor Delgado Pol") y el señor Manuel Francisco Pietri Vélez (en adelante, "señor Pietri Vélez") suscribieron dos (2) escrituras de compraventa ante la notaria Belmari Vélez Plaza.[1] Mediante la primera, la cual se intitulaba Escritura Núm. 5 (en adelante, "Escritura Núm. 5 de Compraventa"), el señor Delgado Pol vendió al señor Pietri Vélez cierto inmueble, que nombraremos Finca A (en adelante, "Finca A").[2] De forma

---

[1] El precio de venta por los inmuebles que se describirán a continuación fue $165,000.00.

[2] La Finca A tenía la siguiente descripción:

> RUSTICA: Parcela de terreno radicado en el Barrio Buenos Aires de Lares, Puerto Rico, con una cabida superficial de

análoga, por medio de la Escritura Núm. 6 (en adelante, "Escritura Núm. 6 de Compraventa"), el señor Delgado Pol vendió al señor Pietri Vélez determinada finca, la cual denominaremos Finca B (en adelante, "Finca B").[3]

En lo relacionado a la Finca A, y conforme a los contratos antes mencionados, el señor Pietri Vélez se comprometió a asumir determinada hipoteca -- con un balance de $89,872.39 -- que gravaba el referido inmueble. Dicha hipoteca estaba constituida a favor de la Cooperativa de

---

ONCE MIL NOVECIENTOS SETENTA PUNTO DOS MIL CUATROCIENTOS DOCE METROS CUADRADOS (11970.2412 M/C) equivalentes a TRES PUNTO CERO CUATROCIENTOS CINCUENTA Y SEIS CUERDAS (3.0456 CDAS) cuyos lindes son; al Norte, en treinta y siete punto dos mil novecientos metros con solar vendido por don Gilberto Morales y cincuenta y seis punto cero quinientos noventa metros con Elías Morales; al SUR, en ochenta y cinco punto seis mil cincuenta metros con remanente de la finca; al ESTE, en ciento treinta y cinco punto dos mil quinientos dieciséis metros y cuarenta y cinco punto seis mil cuatrocientos setenta y nueve metros con remanente; y al OESTE, en cuarenta y nueve punto setenta y tres metros con Miguel A. Rivera, treinta y ocho punto tres mil seiscientos sesenta y un metro con terrenos vendido por Gilberto Morales y en ocho alineaciones con Uso Público que separa de carretera municipal.

Inscrita en el folio ciento treinta y cinco (135) del Tomo trescientos cincuenta y ocho (358) de Lares, Finca diecisiete mil quinientos ochenta y siete (17,587), Inscripción Primera.

[3] La Finca B se describe de la siguiente forma:

RUSTICA: Remanente de finca radicado en el Barrio Buenos Aires del término municipal de Lares, Puerto Rico con una cabida superficial de TREINTA MIL CERO SETENTA Y SIETE PUNTO CUATRO MIL SEISCIENTOS TREINTA Y SIETE METROS CUADRADOS (30,077.4637 M/C) equivalentes a SIETE PUNTO SEIS MIL QUINIENTOS VEINTISEIS DIEZ MILÉSIMAS DE CUERDAS (7.6526 CDAS.), cuyos lindes son; al NORTE, con Carmen Tellado y segregación actual; al SUR, uso público que separa de carretera municipal y José Arce Mejías; al ESTE, David Alicea, parcelas de la Puerto Rico Reconstruction Administration y José Arce Mejías; y al OESTE, segregación actual.

Inscrita al folio cincuenta y cinco (55) del Tomo trescientos sesenta y uno (361) de Lares, Finca cuatro mil ochocientos doce (4,812), Inscripción Undécima (11).

Ahorro y Crédito de Cabo Rojo (en adelante, "Cooperativa de Ahorro y Crédito").[4]

**Ahora bien, en igual fecha, y en garantía de un pagaré al portador por la cantidad de $75,000.00, con vencimiento al 11 de enero de 2015, el señor Pietri Vélez -- mediante las Escrituras Núm. 7 y 8 de Hipoteca -- gravó las Fincas A y B, respectivamente.[5] Al otorgamiento de estas Escrituras de Hipoteca no compareció ningún acreedor hipotecario, sino que sólo fueron otorgadas por el señor Pietri Vélez como deudor hipotecario. Valga precisar que no se hizo distribución alguna de responsabilidad hipotecaria en las Escrituras Núm. 7 y 8 de Hipoteca para las propiedades antes descritas; entiéndase, en qué proporción respondería cada una de las referidas hipotecas.**

Así las cosas, el 4 de febrero de 2015 el señor Delgado Pol incoó una *Demanda* por incumplimiento de contrato, cobro de dinero, reivindicación, resolución y daños y perjuicios en contra del señor Pietri Vélez. En apretada síntesis, alegó que este último no había cumplido con el pago de la hipoteca que gravaba la Finca A, de modo que el señor Delgado Pol había tenido que efectuar los mismos. Por tanto,

---

[4] Las Escrituras Núm. 5 y 6 de Compraventa no constan en el expediente del caso. Por ello, deducimos la fecha de otorgamiento de los instrumentos públicos y el contenido de éstos de la *Sentencia* emitida por el foro primario.

[5] **Cabe mencionar que el pagaré también pautaba intereses por la cantidad de $7,500.00 y $7,500.00 para gastos, costas y honorarios de abogado, en caso de alguna reclamación judicial.**

**De la misma forma, es menester señalar que las escrituras de referencia fueron inscritas en el Registro de la Propiedad.**

solicitó la resolución de los contratos de compraventa celebrados entre las partes; la reivindicación de los inmuebles en controversia; el recobro de las sumas pagadas a la Cooperativa de Ahorro y Crédito; y una partida por daños y perjuicios, además de otros remedios.

Cabe mencionar que, posteriormente, el señor Delgado Pol enmendó la demanda de referencia. Lo anterior, a los fines de aclarar que era el tenedor del pagaré al portador que antes mencionáramos; que el mismo había vencido y la deuda era líquida y exigible; y, como consecuencia, solicitó la correspondiente ejecución de hipoteca.[6]

Así pues, y como parte de los trámites ante el foro primario, el **29 de febrero de 2016** el señor Gerardo González González (en adelante, "señor González González") presentó una *Demanda de intervención*. Éste alegó que había llegado a un acuerdo con el señor Delgado Pol, en el cual se le cedía la Finca B en dación de pago. Señaló que, a pesar de lo anterior, el señor Pietri Vélez se negaba a entregar dicha propiedad. Por tanto, solicitó que el foro primario ordenara la entrega de la misma o, en la alternativa, su venta en pública subasta.[7] **Es necesario señalar que, en determinado momento, el pagaré al portador fue transferido por el señor Delgado Pol al señor González González.**

---

[6] Al contestar la demanda, el señor Pietri Vélez incoó una reconvención en contra del señor Delgado Pol.

[7] **No obstante, la fecha de dicha transferencia no consta en el expediente del caso de epígrafe ni se puede colegir de las determinaciones de hecho de los foros inferiores.**

Dicho ello, y no obstante lo antes mencionado, el **28 de julio de 2016** el señor Pietri Vélez vendió la Finca B al señor Edgardo Crespo Rodríguez (en adelante, "señor Crespo Rodríguez"). Esto, mediante el otorgamiento de la Escritura Núm. 16 de Compraventa.[8] En dicho escrito, se le advirtió al señor Crespo Rodríguez que el inmueble objeto del acuerdo estaba en pugna en determinado procedimiento judicial y las consecuencias de ese hecho. Aun así, el instrumento de referencia fue inscrito en el Registro de la Propiedad.

Mientras ello sucedía, el 29 de noviembre de 2016 el Tribunal de Primera Instancia dictó *Sentencia* en un pleito independiente -- sobre ejecución de hipoteca -- presentado por la Cooperativa de Ahorro y Crédito. Dicha acción surgió como consecuencia de la falta de pago a la hipoteca que gravaba la Finca A. Atendidos los argumentos de las partes, el foro primario ordenó la ejecución de la hipoteca de la finca antes descrita.

**De otra parte, y aún estando pendiente el presente pleito ante los tribunales, el 12 de enero de 2017 el señor Pietri Vélez y el señor Crespo Rodríguez comparecieron ante un notario -- distinto a aquel que otorgó las Escrituras Núm. 7 y 8 de Hipoteca --, para que este último otorgara la Escritura Núm. 3 de *Acta aclaratoria y de subsanación* (en adelante, "*Acta aclaratoria*"). Mediante ella, se**

---

[8] La mencionada escritura no consta en el expediente del presente caso.

distribuyó la responsabilidad hipotecaria que cada finca, a saber, la Finca A y la Finca B, tendría en garantía del pagaré al portador al que hemos hecho referencia. Particularmente, se estableció que cada finca respondería por $37,500.00 con sus intereses, gastos y honorarios de abogado por partes iguales. Empero, el señor González González y los terceros afectados -- si alguno -- no fueron notificados sobre el otorgamiento de la mencionada *Acta aclaratoria*. Esto, a pesar del señor González González presuntamente ser el tenedor del pagaré al portador.[9]

---

[9] Sobre el particular, el foro primario realizó las siguientes determinaciones de hecho:

25. En la escritura número [dieciséis] (16) se indicó que el precio de compraventa era $117,500.00 de los cuales el tercero demandado (comprador) retendría $82,500.00 para el pago en su día de la hipoteca que gravaba la propiedad, más los intereses pactados, y los restantes $35,000.00 se los entregaba al demandado (vendedor).

26. El demandado y el tercero demandado otorgaron ante el notario Ramón A. Hernández Rivera, el 12 de enero de 2017, la Escritura Número Tres (3) sobre Acta Aclaratoria y de Subsanación. La misma se inscribió en el Registro de la Propiedad.

27. Mediante la escritura número tres (3) se determinó la cantidad por la que cada finca respondería del gravamen hipotecario, ya que en las escrituras número siete (7) y número (8), las cuales garantizan el Pagaré al Portador, no se hizo dicha distribución de gravamen.

28. En la escritura número tres (3) se indicó que las referidas fincas responderían cada una por $37,500.00 con sus intereses, gastos y honorarios de abogado por partes iguales, en relación al Pagaré al Portador de $75,000.00.

29. En dicha escritura número tres (3) se corrige la escritura número [dieciséis] (16), aclarando que la compraventa fue por la suma de $72,500.00, habiéndose entregado por el comprador (tercero demandado) y recibido por el vendedor (demandado) la suma de $35,000.00, asumiendo comprador (tercero demandado) la hipoteca que grava la finca por $37,500.00.

Un día después, el 13 de enero de 2017 el señor Delgado Pol presentó una *Segunda demanda enmendada*, mediante la cual incluyó como demandado al señor Crespo Rodríguez, persona a quien, como ya mencionamos, el señor Pietri Vélez vendió la Finca B. Ello, por entender que el señor Crespo Rodríguez era solidariamente responsable junto al señor Pietri Vélez por todas las alegaciones de la demanda.[10]

Acaecidos varios incidentes procesales no necesarios aquí pormenorizar, el 13 de julio de 2018 el señor Delgado Pol solicitó, ante el Tribunal de Primera Instancia, el desistimiento con perjuicio de su reclamación en contra del señor Pietri Vélez. Dicha solicitud fue acogida por el foro primario.

En consecuencia, el 29 de mayo de 2018 el señor González González presentó ante el Tribunal de Primera Instancia una *Moción de sentencia sumaria*. En resumen, en ésta alegó que no existía controversia sobre el hecho de que los señores Pietri Vélez y Crespo Rodríguez otorgaron el *Acta aclaratoria* -- modificando así los términos de la hipoteca -- sin su participación, siendo éste el tenedor del pagaré, razón por la cual el referido instrumento

---

[10] Mediante una *Demanda de intervención (segunda enmienda demanda contra tercero)*, fechada el 31 de enero de 2018, el señor González González -- entre otras cosas -- enmendó su demanda contra tercero, aduciendo que los señores Pietri Vélez y Crespo Rodríguez habían otorgado el *Acta aclaratoria*. En específico, sostuvo que éstos "conocían que NO [eran] los tenedores del pagaré y que el mismo [había sido] negociado por valor al interventor y más aún, con pleno conocimiento del pleito de autos". Véase, *Apéndice* del *Alegato del recurrido*, pág. 59.

público debía declararse nulo y procedía ejecutar las hipotecas por el saldo total del pagaré.

Evaluados los planteamientos de las partes, el 12 de septiembre de 2018 el foro primario emitió una *Sentencia* declarando ha lugar las acciones de cobro de dinero y ejecución de hipoteca, mientras que declaró no ha lugar las acciones de nulidad y daños incoadas por el señor González González. Al así hacerlo, dicho foro concluyó que el pagaré al portador objeto del presente litigio estaba vencido y que el señor Pietri Vélez no había realizado pago alguno sobre el mismo. De igual forma, determinó que el negocio jurídico celebrado por los señores Pietri Vélez y Crespo Rodríguez, es decir, la compraventa efectuada mediante la Escritura Núm. 16, era válido.

Expuesto lo anterior, el foro primario aclaró que, al momento de otorgar las hipotecas que garantizaron el pagaré en controversia, solamente compareció el señor Pietri Vélez como deudor hipotecario, pero no así el acreedor hipotecario. Además, recalcó que, si bien en las Escrituras Núm. 7 y 8 de Hipoteca no se distribuyó la responsabilidad hipotecaria, dicho acto se realizó posteriormente mediante el *Acta aclaratoria*. Así, a juicio del Tribunal de Primera Instancia, "no exist[ía] impedimento en ley para que el demandado unilateralmente distribuyera a cada finca la cantidad por la que responderían respecto al [p]agaré al [p]ortador", declarando el *Acta aclaratoria* válida.

Apoyado en dicho análisis, el foro primario concluyó que -- a pesar de que el señor Pietri Vélez estaba obligado a pagar el importe entero del pagaré -- la Finca B respondía hasta un máximo de $37,500.00 en principal, $3,500.00 por intereses y $3,500.00 para gastos, costas y honorarios, de la deuda. De igual modo, expuso que la Finca A no podía ser ejecutada para satisfacer la deuda, toda vez que la Cooperativa de Ahorro y Crédito ya lo había hecho.

Inconforme con dicho resultado, el señor González González presentó una moción de reconsideración ante el Tribunal de Primera Instancia. Tal pedido fue denegado.

Insatisfecho aún, el 2 de enero de 2019 el señor González González presentó un recurso de apelación ante el Tribunal de Apelaciones. En éste, arguyó que el Tribunal de Primera Instancia incidió al concluir que el *Acta aclaratoria* era válida, ya que la misma fue otorgada sin el consentimiento del acreedor o una orden del tribunal, y tuvo el efecto de modificar los términos de una hipoteca inscrita en el Registro de la Propiedad, la cual -- a su vez -- modificaba un pagaré que ya había sido negociado. Oportunamente, la parte recurrida presentó su oposición.

Analizados los argumentos de las partes, el foro apelativo intermedio modificó el dictamen recurrido. En esencia, expresó que los señores Pietri Vélez y Crespo Rodríguez suscribieron el *Acta aclaratoria* para estipular la distribución de responsabilidad entre las fincas hipotecadas, ya que ello no había ocurrido previamente.

**Asimismo, enfatizó que éstos tomaron dicha acción sin la intervención del señor González González, a pesar de conocer que este último era portador del pagaré.**

Dicho esto, el Tribunal de Apelaciones concluyó que, contrario a lo expuesto por el foro primario, el caso de *Fuster Fuster v. Registrador*, *infra*, no era de aplicación a la causa de epígrafe, ya que había un pagaré que fue negociado. Siendo ello así, existía un contrato bilateral vinculante entre las partes, incluyendo el acreedor de la deuda.[11] Al este último no comparecer al otorgamiento del *Acta aclaratoria*, el tribunal *a quo* decretó la nulidad de la misma y determinó que procedía que la Finca B respondiera por la totalidad de la hipoteca constituida mediante pagaré al portador en poder del señor González González.

No conforme con dicho proceder, el señor Pietri Vélez presentó ante el foro apelativo intermedio una moción de reconsideración. Dicha solicitud fue denegada.

Así las cosas, el 10 de marzo de 2020 el señor Crespo Rodríguez presentó un recurso de *certiorari* ante esta Curia.[12] En esencia, alega que el foro apelativo intermedio erró al: 1) determinar que el señor Pietri Vélez no tenía

---

[11] En específico, el foro apelativo intermedio sostuvo que "[l]as hipotecas constituidas en garantía de un pagaré al portador se consideran contratos unilaterales, que no requieren de la presencia del acreedor para su formulación. Sin embargo, tan pronto como se negocia dicho pagaré al portador, el contrato se vuelve en uno bilateral". Véase, *Apéndice* del recurso de *certiorari*, pág. 22.

[12] Estando dicho recurso pendiente ante nuestra consideración, el señor Pietri Vélez presentó una *Moción en auxilio de jurisdicción*, mediante la cual nos solicitó que paralizáramos los procedimientos ante el foro primario. Dicha petición fue concedida por este Tribunal.

la autoridad de suscribir el *Acta aclaratoria* junto al señor Crespo Rodríguez, sin la comparecencia del señor González González; 2) concluir que el caso de *Fuster Fuster v. Registrador*, *infra*, no era de aplicación a la presente controversia; 3) resolver que mediante el *Acta aclaratoria* no podía efectuarse la distribución de responsabilidad hipotecaria, ya que una de las fincas había sido ejecutada y ya no estaba en posesión del señor Pietri Vélez; y 4) determinar que la totalidad de la deuda recae sobre la Finca B, de la cual el señor Crespo Rodríguez es poseedor.[13] Oportunamente el señor González González presentó su alegato en oposición.

Trabada así la controversia, expedimos el recurso, y con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II.

Como es sabido, la *Ley de Transacciones Comerciales*, Ley Núm. 208-1995, 19 LPRA 401 *et seq.*, según enmendada (en adelante, "Ley de Transacciones Comerciales"), tiene como objetivo -- entre otras cosas -- "[s]implificar, clarificar y modernizar el derecho que rige las transacciones

---

[13] Ante dicha solicitud, el señor González González presentó una *Solicitud de desestimación de recurso por defecto grave*, la cual fue denegada por este Foro.

Asimismo, tras varios trámites procesales, incluyendo la expedición del auto de *certiorari*, el señor Crespo Rodríguez presentó un *Alegato a petición de certiorari*, donde expone argumentos análogos a los enumerados anteriormente. De forma similar, el señor González González presentó el correspondiente alegato, mediante el cual expuso argumentos parecidos a los expuestos por el Tribunal de Apelaciones en su *Sentencia*.

comerciales". Sección 1-102, Ley de Transacciones Comerciales, 19 LPRA sec. 401(2). Véase, *DLJ Mortgage Capital, Inc. v. Santiago Martínez*, 202 DPR 950, 963 (2019); *COSSEC v. González López*, 179 DPR 793, 802 (2010); *Westernbank v. Registradora*, 174 DPR 779, 786 (2008).

En vista de dicho propósito, y en lo referente a los instrumentos negociables, el mencionado estatuto dispone que éstos son "una promesa o una orden incondicional de pago de una cantidad específica de dinero, con o sin intereses u otros cargos descritos en la promesa u orden, si el mismo […] es pagadero al portador o a la orden al momento de su emisión o cuando primero adviene en posesión de un tenedor".[14] Sección 2-104(a), Ley de Transacciones Comerciales, 19 LPRA sec. 504(a). Véase, *Des. Caribe v. Ven-Lour Enterprises*, *supra*, pág. 298; *COSSEC v. González López*, *supra*, págs. 799, 803; *Westernbank v. Registradora*, *supra*. En ese contexto, una promesa constituye un "compromiso escrito de pagar dinero [,] suscrito por la persona que se obliga a pagar". Sección 1-201(9), Ley de Transacciones Comerciales, 19 LPRA sec. 451(9). *Westernbank v. Registradora*, *supra*.

En esa dirección, es menester precisar que un pagaré es un instrumento negociable que, como tal, contiene una

---

[14] Con ello, nos referimos a que "[l]os instrumentos negociables son documentos de crédito que incorporan el derecho a cobrar una suma de dinero, a los cuales el derecho cambiario les confiere una facilidad de circulación especial". *Des. Caribe v. Ven-Lour Enterprises*, 198 DPR 290, 297 (2017).

promesa de pago.[15] Véase, M.R. Garay Aubán, *Derecho cambiario de Estados Unidos y Puerto Rico*, Ponce, Ed. Revista de Derecho Puertorriqueño, 1999, pág. 98. Debido a su naturaleza, sabemos que, en esencia, el "pagaré es la forma más sencilla de instrumento negociable", ya que permite que dos (2) personas intervengan en su otorgamiento: el firmante u otorgante y el tenedor. Garay Aubán, *op. cit.*, pág. 98.

Sobre el pagaré al portador o a la orden, la Ley de Transacciones Comerciales, *supra*, nos dice que:

> (a) Una promesa u orden es pagadera al portador si la misma:
> (1) especifica que es pagadera al portador o a la orden del portador o de otra forma indica que la persona en posesión de la promesa u orden tiene derecho al pago;
> (2) no designa un tomador;
> (3) especifica que es pagadera a, o a la orden de, efectivo ("cash") o de otra forma indica que no es pagadera a una persona identificada. Sección 2-109(a), Ley de Transacciones Comerciales, 19 LPRA sec. 509(a).

De forma que, en lo pertinente a lo anterior, un portador será "la persona en posesión de un instrumento, documento de título, o valor con certificado pagadero al portador o endosado en blanco". Sección 1-201(5), Ley de Transacciones Comerciales, 19 LPRA sec. 451(5).

---

[15] A esos efectos, la Ley de Transacciones Comerciales indica que "[u]n instrumento es un '*pagaré*' si es una promesa y es un '*giro*' si es una orden". (Énfasis en el original). Sección 2-104(e), Ley de Transacciones Comerciales, 19 LPRA sec. 504(e).

III.

A.

De otra parte, y por ser de particular importancia para la correcta disposición de las controversias que nos ocupan, debemos recordar aquí que la hipoteca es:

> **[U]n derecho real que, ya de momento, sujeta o vincula lo hipotecado, cualquiera que sea su titular, al poder de exigir eventualmente la realización de su valor así como la adopción de medidas dirigidas a salvaguardarlo, todo en seguridad o garantía de la efectividad de alguna obligación dineraria, y cuyo derecho es de carácter accesorio, indivisible, de constitución registral, y grava bienes, ajenos y enajenables, que permanecen en posesión de su propietario o titular, y el cual implica un poderoso instrumento del crédito territorial.** (Énfasis suplido). R.M. Roca Sastre y otros, *Derecho hipotecario*, Barcelona, Ed. Bosch, 2009, T.VIII, págs. 15-16. Véase, también, *Haedo Castro v. Roldán Morales*, 203 DPR 324, 341 (2019).

Cónsono con lo anterior, y según expuesto en el antiguo Código Civil de 1930 -- ordenamiento legal vigente al momento en que ocurrieron los hechos que dieron génesis al presente caso --, la hipoteca sujeta "directa e inmediatamente los bienes sobre [los] que se impone, cualquiera que sea su poseedor, al cumplimiento de la obligación para cuya seguridad fue constituida". Art. 1775, Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5043.

En cuanto a su constitución, el Art. 1756 del anterior Código Civil de 1930, 31 LPRA ant. sec. 5001, enumeraba los siguientes requisitos fundamentales para el otorgamiento de un contrato de hipoteca: que se constituya para asegurar

el cumplimiento de una obligación principal; que la cosa hipotecada pertenezca en propiedad a quien la hipoteca; y que las personas que constituyan la hipoteca tengan libre disposición de sus bienes o, de no tenerla, que tengan autorización legal para ello. *Íd*. Véase, *Dist. Unidos Gas v. Sucn. Declet Jiménez*, 196 DPR 96, 110 (2016); *Westernbank v. Registradora*, *supra*, pág. 784; L. Rivera Rivera, *Derecho registral inmobiliario puertorriqueño*, 3era ed. rev., San Juan, Ed. Jurídica Editores, 2012, pág. 486.

**Además, el Art. 1774 del mismo cuerpo reglamentario, 31 LPRA ant. sec. 5042, requería que -- como condición para su validez -- la hipoteca fuera inscrita en el Registro de la Propiedad.** Véase, *Haedo Castro v. Roldán Morales, supra*, págs. 341-342; *Dist. Unidos Gas v. Sucn. Declet Jiménez*, *supra*, pág. 111; *Westernbank v. Registradora*, *supra*; Rivera Rivera, *op. cit.*, págs. 486-487. Dicha exigencia fue integrada en el Art. 188 de la ahora derogada *Ley Hipotecaria y del Registro de la Propiedad*, 30 LPRA ant. sec. 2605 (en adelante, "Ley Hipotecaria"), donde se estableció -- como requisito para la constitución de una hipoteca voluntaria -- que ésta fuese acordada en una escritura pública e inscrita en el Registro de la Propiedad.[16]

---

[16] Véase, por ejemplo, los Arts. 1011-1016 del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA secs. 8731-8736, para analizar las nuevas disposiciones aplicables al tema de referencia.

De conformidad con lo antes expuesto, y enfatizando así la naturaleza constitutiva de la figura de referencia, esta Curia ha sentenciado que **"la garantía de un crédito personal no se constituye en garantía real —hipoteca— hasta que es inscrita en el Registro"**. (Énfasis suplido). *Haedo Castro v. Roldán Morales*, *supra*, pág. 342 (citando a *Rosario Pérez v. Registrador*, 15 DPR 491, 493 (1984)). En otras palabras, es por vía de la inscripción que la garantía produce un efecto real y eficaz de manera *erga omnes*. Rivera Rivera, *op. cit.*, pág. 487.

**En esa dirección, es útil aclarar que, en ocasiones donde por determinada razón la escritura de hipoteca no logra su inscripción en el Registro de la Propiedad, ésta "constituye prueba como documento privado y, por ende, vale como negocio jurídico entre los otorgantes si concurren los requisitos contractuales de consentimiento, objeto y causa"**. (Énfasis suplido). Rivera Rivera, *op. cit.*, pág. 487. **De manera que, a pesar de que no advenga a la vida la garantía real de hipoteca, subsiste una deuda personal.** Véase, *Rosario Pérez v. Registrador*, *supra*; *P.R. Prod. Credit. Assoc. v. Registrador*, 123 DPR 231 (1941).

B.

**De forma relacionada, y en lo referente a los requisitos para la correcta constitución de una hipoteca, la Ley Hipotecaria -- vigente al momento en que se desarrollaron los hechos que dieron margen a la causa de**

epígrafe --,[17] **también disponía que, en las instancias donde se hipotecaran varias fincas a la vez por un solo crédito, "se determinará la cantidad o parte del gravamen de que cada una deba responder".**[18] (Énfasis suplido). Art. 170, Ley Hipotecaria, 30 LPRA sec. 2566. Véase, también, Rivera Rivera, *op. cit.*, págs. 560-562; E. Clavell Borrás, *Derecho hipotecario de Puerto Rico*, 2da ed., San Lorenzo, Ed. Litolibros, 1976, págs. 194-195; *Banco de Santander de P.R. v. Registrador*, 115 DPR 44, 47 (1984). **Análogamente, el Art. 71 de la vigente Ley Núm. 210-2015, 30 LPRA sec. 6001 *et seq.* -- conocida como *Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico* (en adelante, "Ley del Registro") -- dispone que "[c]uando se hipotequen varias fincas a la vez por un solo crédito, se determinará la cantidad o parte del gravamen de que cada una deba responder, incluyendo créditos accesorios y valor de tasación".** (Énfasis suplido). 30 LPRA sec. 6098.

Al respecto, nos comentan las profesoras Ana C. Gómez Pérez y Lourdes I. Quintana Lloréns que, aunque de ordinario

---

[17] Es útil aclarar que, si bien se otorgaron ciertos instrumentos -- como lo son las Escrituras Núm. 7 y 8 de Hipoteca -- durante la vigencia de la Ley Hipotecaria, *supra*, otros instrumentos, como el *Acta aclaratoria*, fueron otorgados durante la vigencia de la *Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico*, *infra*.

[18] Dicha disposición está arraigada en la doctrina española, ya que ésta "desde el año 1861, exige, como requisito necesario la *previa distribución de la responsabilidad real hipotecaria entre las varias fincas, derechos o cuotas* a hipotecar". (Énfasis en el original). Roca Sastre y otros, *op. cit.*, 2009, T. IX, pág. 246. Como consecuencia de nuestra relación con España y su influencia sobre nuestro sistema registral inmobiliario, el principio de referencia se integró a nuestro ordenamiento. Véase, por ejemplo, *Ortiz v. Registrador*, 16 DPR 676 (1910).

el crédito hipotecario se garantiza con un solo bien o derecho, existen situaciones donde se pueden comprometer dos (2) o más bienes, sin embargo, en estas últimas -- para cumplir con el principio de especialidad -- la distribución del crédito hipotecario entre las fincas debe constar. A.C. Gómez Pérez y L.I. Quintana Lloréns, *La hipoteca en el derecho inmobiliario registral puertorriqueño*, Bogotá, Ed. TEMIS, 2021, pág. 97. **Esto se debe a que, "[e]l no distribuir el crédito -es decir, mantener la totalidad de la cantidad prestada como carga sobre cada una de las fincas- se interpreta como una hipoteca solidaria al inicio" y esta figura no es inscribible, por lo que la garantía es ineficaz.** (Énfasis suplido). *Íd.* Añaden las profesoras que el Art. 71 de la Ley del Registro, *supra*, busca impedir que "el acreedor pueda repetir por la totalidad de la suma asegurada contra cualquier de las fincas gravadas o contra todas ellas". *Íd.*, pág. 98.

Paralelamente, el Art. 157.1 del antiguo *Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad*, Reglamento Núm. 2647, 9 de julio de 1980, según enmendado, disponía que:

> **No se inscribirá ninguna hipoteca sobre varias fincas, derechos reales o porciones ideales de unas y otros, afectos a una misma obligación, sin que por convenio entre las partes, o por mandato judicial, en su caso, se determine previamente la cantidad de que cada finca, porción o derecho deba responder. Los interesados podrán acordar la distribución en el mismo título inscribible o en otro documento público.** (Énfasis suplido). Véase, Rivera Rivera, *op. cit.*, págs. 560-562; *Banco de*

*Santander de P.R. v. Registrador*, *supra*, págs. 47-48.

Así también, el texto de la Regla 71.1 del *Reglamento General para la Ejecución de la Ley del Registro de la Propiedad Inmobiliaria*, Reglamento Núm. 8814, 14 de septiembre de 2016, según enmendado, establece -- esencialmente -- lo mismo. Al evaluar las disposiciones reglamentarias y estatutarias antes descritas, podemos apreciar que la distribución de responsabilidad hipotecaria se contempla en dos (2) planos: mediante el acuerdo de las partes o, en la alternativa, por vía de un mandato judicial.

Esta obligación de distribuir la responsabilidad hipotecaria responde al principio de especialidad; elemento esencial de nuestro sistema registral inmobiliario. Véase, Rivera Rivera, *op. cit.*, págs. 560-561; *Banco de Santander de P.R. v. Registrador*, *supra*, pág. 48. En consecuencia, es irrenunciable mediante pacto o acuerdo. *Gómez v. Registrador*, 35 DPR 60 (1926). Sobre el propósito de dicha disposición, esta Curia ha recalcado:

> [Q]ue cada finca responda sólo de una cantidad determinada, […] que la carga real no se ext[ienda] más que a la cifra que import[a] el préstamo, e imp[ide] las inmoderadas pretensiones de los acreedores que no contentos con garantías firmes, exigen otras innecesarias, perjudicando en gran manera el crédito territorial. (Cita suprimida). *Banco de Santander de P.R. v. Registrador*, *supra*. Véase, también, *Galiñanes Hnos., Inc. v. Registrador*, 65 DPR 576, 579-580 (1946).[19]

---

[19] Vale aquí recordar que la "[l]ey s[ó]lo estipula dos (2) supuestos en que la violación del principio de especialidad convierte en no inscribible la hipoteca. El primero es cuando son dos (2) o más bienes que garantizan la obligación ab initio y no se efect[ú]a la

Ahora bien, en el caso de hipotecas constituidas para garantizar un pagaré al portador, el principio de distribución de responsabilidad es igualmente aplicable. *Gómez v. Registrador*, *supra*. No obstante, en dichas instancias, la aceptación de la distribución por parte de los acreedores no es necesaria. En ese sentido:

> La imposibilidad de que en estos casos el acreedor hipotecario acepte la distribución, es evidente, pues los acreedores son personas indeterminadas y desconocidas. Es este un caso de excepción al Art. 164 del Reglamento pues la distribución se hace unilateralmente por el deudor hipotecario, sin mediar convenio entre las partes ni mandato judicial. Aparte de ello, al ponerse en circulación las obligaciones hay una aceptación tácita de la hipoteca. *Fuster Fuster v. Registrador*, 88 DPR 475, 478 (1963). Véase, también, A. de Cossio y Corral, *Lecciones de Derecho Hipotecario*, Barcelona, Ed. Bosch, 1945, pág. 216.

En el precitado caso de *Fuster Fuster v. Registrador*, *supra*, la corporación Mueblerías Fuster, Inc. suscribió un pagaré a favor del señor Enrique Calimano McCormick, o a su orden. En el mismo, se hizo constar que dicha obligación sería garantizada por cierta hipoteca sobre dos (2) fincas. Así las cosas, los esposos Fuster González, al igual que Mueblerías Fuster, Inc., otorgaron una escritura, mediante la cual constituyeron unilateralmente una hipoteca sobre (2) fincas -- propiedad del matrimonio antes señalado -- en garantía del aludido pagaré.

---

distribuci[ó]n del cr[é]dito". A.C. Gómez Pérez, *Derecho registral inmobiliario*, 78 Rev. Jur. UPR 411, 429 (2009).

Ahora bien, tras presentarse la escritura ante el Registro de la Propiedad, el Registrador notificó un error subsanable de "no estar aceptada en forma legal la escritura objeto de inscripción a los efectos de la distribución de responsabilidad hipotecaria entre las fincas gravadas por el acreedor hipotecario". *Íd.*, pág. 476. Ante ese panorama, y en lo relacionado a la distribución de responsabilidad en hipotecas voluntarias constituidas para garantizar pagarés endosables o al portador, este Tribunal debía responder la siguiente interrogante: "¿exige la ley que los acreedores hipotecarios, acepten la distribución de la responsabilidad de las fincas hipotecadas?". *Íd.*, pág. 478. Dicha pregunta fue contestada en la negativa. Esto, ya que, en cuanto a las instancias de los pagarés al portador en particular, -- a juicio de esta Curia -- los acreedores son indeterminados.

Es decir, desde *Fuster Fuster v. Registrador*, *supra*, quedó establecido que, por excepción, en este contexto se permite que la distribución se haga unilateralmente por el deudor hipotecario, pues los acreedores se desconocen. Al respecto, nos señala el tratadista Luis Rafael Rivera Rivera que "[p]or razones obvias, en este supuesto no se puede seguir la regla de distribución utilizada en los casos normales". Rivera Rivera, *op. cit.*, pág. 561. Es, pues, debido a su naturaleza que se presupone la aplicación de cierta reglamentación especial. Véase, Roca Sastre y

otros, *op. cit.*, 2009, T.IX, pág. 445. No obstante, tal no es el caso de autos.

En contraparte de lo anteriormente expuesto, cabe mencionar que, según ha reiterado este Foro:

> la escritura de hipoteca en garantía de un pagaré hipotecario al portador no es un contrato bilateral en el momento de su otorgamiento, ni puede ser considerada como tal hasta que el pagaré haya sido negociado por el deudor mediante su entrega a la persona que a su vez le entrega el importe del préstamo. Pero tan pronto como el deudor recibe el importe del préstamo y el acreedor acepta el pagaré, como evidencia de la deuda, la oferta contenida en la escritura de hipoteca se convierte en un contrato válido y obligatorio para una y otra parte contratante. *Morales v. Registrador*, 54 DPR 546, 548 (1939). Véase, también, *R&G v. Registradora*, 162 DPR 602, 610-611 (2004); *Liechty v. Descartes Saurí*, 109 DPR 496, 502 (1980).

IV.

Por último, es menester mencionar que en ocasiones existen inexactitudes en las constancias de los derechos inscritos en el Registro de la Propiedad. Véase, *Dist. Unidos Gas v. Sucn. Declet Jiménez*, *supra*, pág. 119. Por inexactitud en el Registro de la Propiedad "se entiende todo desacuerdo que en orden a los derechos inscribibles exista entre aquél y la realidad jurídica extraregistral". Art. 110, Ley Hipotecaria, 30 LPRA ant. sec. 2360. A tono con lo anterior, los asientos practicados en el Registro de la Propiedad se entenderán defectuosos si en ellos se omite -- o se expresa con inexactitud sustancial -- alguna de las circunstancias exigidas por la Ley Hipotecaria. Véase, Art. 100, Ley Hipotecaria, 30 LPRA ant. sec. 2321.

Es por ello que, el precitado estatuto contempla la corrección del asiento que dio margen a la inexactitud en el Registro de la Propiedad a través del mecanismo de la rectificación. *Dist. Unidos Gas v. Sucn. Declet Jiménez*, *supra*. Esto último podrá ser solicitado por el titular del dominio o derecho real, ya sea el titular inscrito, el titular inscrito erróneamente o aquel que resulte lesionado por la inexactitud. Art. 110, Ley Hipotecaria, 30 LPRA ant. sec. 2321.

Particularmente, y en lo que concierne al presente caso, la Ley Hipotecaria, *supra*, vigente al momento de los hechos que dieron margen al presente asunto, contemplaba el mecanismo de la rectificación para -- entre otras instancias -- atender aquellos escenarios en los que la inexactitud registral procediera de la falsedad, **nulidad** o defecto del título que hubiere motivado el asiento.[20] Art. 110 (d), Ley Hipotecaria, *supra*. De tratarse de alguna de estas causales, la rectificación precisaría el consentimiento del titular afectado por ella o, a falta del mismo, se realizaría mediante resolución judicial. *Íd.* Si se solicitaba la corrección por la vía judicial, la demanda a esos fines debía dirigirse contra aquellas personas a quienes el asiento que se tratase de rectificar concediese algún derecho y en ningún caso la rectificación

---

[20] De igual forma, la actual Ley del Registro, *supra*, contempla el referido mecanismo de la rectificación en su Art. 211. 30 LPRA sec. 6351.

perjudicaría los derechos legítimamente adquiridos por terceros. *Íd.*

Cónsono con lo anterior, y a modo de síntesis, nuestro ordenamiento registral vigente permite que un error en el asiento de presentación sea corregido por el Registrador -- *motu proprio* o a solicitud de parte -- siempre que con dicha acción no se afecten derechos de titulares inscritos y que cuente con el instrumento que motivó la acción. Art. 151, Ley Hipotecaria, 30 LPRA ant. sec. 2502. Véase, *DLJ Mortgage v. García Ramos*, 2021 TSPR 66, 207 DPR ___ (2021); *Gasolinas PR v. Registrador*, 155 DPR 652, 687-688 (2001). **Cuando la rectificación pudiera afectar estos derechos, se exigirá el consentimiento de dichos titulares o una resolución judicial ordenando la corrección del asiento.** Art. 151, Ley Hipotecaria, 30 LPRA ant. sec. 2502. Véase, *DLG Mortgage v. García Ramos*, *supra*; *Cruz Fontánez v. Registrador*, 126 DPR 182, 185 (1990).

Ahora bien, precisa distinguir aquí el mecanismo de la rectificación de la facultad que poseen los notarios para corregir ciertos instrumentos públicos. Según el Art. 29 de la *Ley Notarial de Puerto Rico*, 4 LPRA sec. 2047, los defectos de que adolezcan los documentos notariales *ínter vivos* podrán ser subsanados, sin perjuicio de terceros, por las partes que hubiesen comparecido en el documento o por sus herederos o causahabientes por medio de una escritura pública en la cual se haga constar el defecto, la causa y la declaración que lo subsana. Asimismo, si el notario o

notaria no hace constar algún dato o circunstancia exigida por ley -- o si se tratase de error en el relato de hechos presenciados por los referidos funcionarios -- dichas omisiones podrán ser subsanadas por el notario autorizante a sus expensas por medio de acta notarial. *Íd.* En este último escenario antes descrito, se autoriza el uso de actas de subsanación. Art. 29, Ley Notarial de Puerto Rico, *supra*. Véase, también, *In re Godinez Morales*, 161 DPR 219, 250-251 (2004).

Un acta de subsanación se define como el instrumento que redacta el notario o notaria -- sin intervención de las partes otorgantes y sin perjuicio de una tercera persona -- con el propósito de corregir los defectos u omisiones de que adolezca un instrumento público. Regla 39, Reglamento Notarial de Puerto Rico, 4 LPRA Ap. XXIV, R. 39. Véase, además, *In re Rivera Vázquez*, 155 DPR 267, 280 (2001). En dicho documento, el referido funcionario hará constar que la subsanación obedece a datos o hechos que presenció o que de otro modo le constan personalmente y **que no afectan el negocio jurídico.** Regla 39, Reglamento Notarial de Puerto Rico, *supra*. Véase, además, *In re Rivera Vázquez*, *supra*, pág. 280. **Este tipo de subsanación, quien único puede realizarla es el notario autorizante, a menos que éste haya sido suspendido, en cuyo caso comparecerá ante otro notario.** Regla 39, Reglamento Notarial de Puerto Rico, *supra*.

A modo de ejemplo, la Regla 39 del Reglamento Notarial, *supra*, enumera varios defectos u omisiones que pueden subsanarse a través de dichas actas, entre los cuales podemos destacar: 1) el nombre y/o apellidos de los comparecientes así como sus circunstancias personales; 2) la omisión o incorrección en la descripción de una propiedad cuando se haga para conformar la información en el instrumento a cualquier información que surja del Registro de la Propiedad; y 3) la falta de expresión notarial sobre la identidad o la capacidad de las personas otorgantes. Asimismo, se dispone en la mencionada regla que los documentos *ínter vivos* podrán quedar subsanados mediante acta de subsanación o mediante diligencia subsanatoria, "[e]n aquellos casos en que la subsanación no modifique, cambie o supla la voluntad de una o todas las personas comparecientes ni altere la esencia del instrumento subsanado". Regla 39, Reglamento Notarial de Puerto Rico, *supra*.

De lo anterior, podemos colegir que el notario cuenta con dos (2) mecanismos a través de los cuales puede corregir los defectos u omisiones en los instrumentos públicos, a saber: las actas de subsanación y las escrituras de rectificación. *In re Godinez Morales*, *supra*, pág. 250. Véase, Secretariado de la Conferencia Judicial, *De los instrumentos públicos*, 30 Rev. Jur. UIPR 25, 44-45 (1995). **Así, y "[c]uando el defecto u omisión no afecta sustantivamente el contrato o negocio jurídico objeto de**

**la escritura pública, el notario podrá corregirlo por sí solo sin necesidad de requerir la presencia de los comparecientes".** (Énfasis suplido). *In re Godinez Morales*, *supra*, págs. 250-251 (citando a Torres Peralta, *El Derecho Notarial Puertorriqueño,* San Juan, Publicaciones STP, 1995, pág. 8.61). Dicha corrección deberá hacerla a través de un acta notarial de subsanación. *Íd.*

**Por el contrario, y según adelantamos, cuando el error u omisión esté relacionado al negocio jurídico, el notario o notaria estará impedido o impedida de subsanarlo** *motu proprio*. *In re Godinez Morales, supra*. **"En tales circunstancias se requerirá nuevamente la comparecencia de los otorgantes para corregir o rectificar el defecto. Sin embargo, ya no podrá utilizarse el acta notarial, sino que deberá otorgarse una escritura de rectificación o corrección".** (Énfasis suplido). *Íd*. Véase, Art. 29, Ley Notarial de Puerto Rico, *supra*. Véase, también, Torres Peralta, *op. cit.*, pág. 8.62.

Es, pues, a la luz de la normativa antes expuesta que procedemos a resolver las controversias ante nuestra consideración.

V.

Como mencionamos previamente, el señor Crespo Rodríguez nos solicita que revoquemos el dictamen del Tribunal de Apelaciones, ya que -- a su juicio -- dicho foro erró al concluir que el señor Pietri Vélez no tenía autoridad para, junto a éste, otorgar el *Acta aclaratoria*

sin la comparecencia del señor González González. Por consiguiente, añade el señor Crespo Rodríguez que tal foro se equivocó al dictaminar que la totalidad de la deuda del pagaré recae sobre la Finca B, la cual está en su posesión. No le asiste la razón. Como explicamos más adelante, el *Acta aclaratoria* en cuestión es nula.

Ahora bien, como cuestión de umbral -- y previo a expresarnos en cuanto a la validez del *Acta aclaratoria*--, es nuestro deber dejar meridianamente claro que las Escrituras Núm. 7 y 8 de Hipoteca, objetos del presente litigio, también son nulas. Esto, pues, de conformidad con el Art. 170 de la Ley Hipotecaria, *supra*, en las instancias donde se hipotecan varias fincas a la vez por un solo crédito, como requisito para su constitución, se debe determinar la cantidad o parte del gravamen por la cual cada una responderá. Ello no sucedió en el presente caso.[21]

Aquí, por el contrario, se intentó realizar la referida distribución mediante un *Acta aclaratoria* que, como ya mencionamos, es nula. Nula por dos (2) razones.

En primer lugar, para poder subsanar el defecto en las Escrituras Núm. 7 y 8 era un requisito *sine qua non* que

---

[21] En esa dirección, es importante puntualizar que en la Escritura Núm. 7 y 8 de Hipoteca, el pagaré al portador dispone:

Este pagaré quedará garantizado con dos hipotecas sobre unas propiedades inmuebles, según expresan en las Escrituras Número Siete (7) y Ocho (8) de esta misma fecha, otorgadas ante la notaria fedante Belmari Vélez Plaza.

Así pues, debe quedar claro que, aunque se hipotequen varias fincas mediante escrituras separadas -- como ocurrió aquí --, ello no invalida el requisito estatutario de distribuir la responsabilidad, pues ambas hipotecas garantizan un solo crédito, entiéndase, el pagaré al portador.

tanto el deudor como el acreedor, así como cualquier tercero afectado, consintieran a la distribución de responsabilidad que le adjudicarían a cada finca hipotecada por medio de una escritura de rectificación, en vez de un acta aclaratoria y de subsanación. Lo anterior se debe a que, al haberse negociado el pagaré y entregado el importe del préstamo, se conocía la identidad del acreedor y se constituyó un contrato bilateral entre las partes. No obstante, ni los aludidos consentimientos ni la correspondiente escritura de rectificación ocurrieron aquí, lo que hace el referido negocio jurídico uno nulo.

En segundo lugar, y lo que también hace nula la referida *Acta aclaratoria*, el notario que autorizó la misma fue uno distinto a aquel que otorgó las escrituras de hipoteca. Según indicamos, un notario no puede subsanar un error cometido en un instrumento público de otro notario o notaria; a menos, claro está, que este último esté suspendido de la profesión. Tal excepción no está presente en el caso de autos. Lo que es peor, el notario aludió a la comparecencia de los señores Pietri Vélez y Crespo Rodríguez en el *Acta aclaratoria* de referencia, sin embargo, del expediente se desprende que estos últimos no la firmaron ni la inicialaron. En otras palabras, el notario -- *motu proprio* -- pretendió subsanar una omisión relacionada al negocio jurídico sin la comparecencia del deudor ni del acreedor hipotecario.

Así las cosas, decretada la nulidad de las hipotecas en cuestión, y no habiéndose subsanado el defecto en la distribución de responsabilidad a través de los mecanismos contemplados por nuestro ordenamiento registral, lo que tiene disponible el señor González González es una acción personal en cobro de dinero por ser éste el tenedor del pagaré al portador objeto del presente litigio.

## VI.

Por los fundamentos antes expuestos, se modifica el dictamen del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma cónsona con lo aquí resuelto.

Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ángel Rafael Delgado Pol<br><br>    Recurrido<br><br>        v.<br><br>Manuel Francisco Pietri Vélez<br><br>    Recurrido<br><br>        v.<br><br>Edgardo Crespo Rodríguez<br><br>    Peticionario<br><br>Gerardo González González<br><br>    Interventor-Recurrido | CC-2020-159 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico a 13 de enero de 2022.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se modifica el dictamen del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma cónsona con lo aquí resuelto.

Lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo de Puerto Rico.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo